### INJURY FROM AN EXPLOSION IN A TORPEDO FACTORY.

Circuit Court of Cuyahoga County.

MARTIN J. MAYER, AS NEXT FRIEND OF MAME S. MAYER, v. ISAAC BRUDNO.*

Decided, January 25, 1909.

A torpedo factory exploded, blowing out a window in a neighboring building and injuring the plaintiff. In an action against the lessor of the building in which the torpedoes were being manufactured, *Held:* It was for the jury to say whether the business of manufacturing torpedoes was dangerous and such that an explosion might reasonably be anticipated, and whether the defendant had such knowledge of the nature of the business carried on that reasonable prudence on his part would have anticipated that an explosion might occur.

*Walter D. Meals,* for plaintiff in error.
*Ezra Brudno,* contra.

MARVIN, J.; WINCH, J., and HENRY, J., concur.

The parties here stand related to each other as they did in the court below. The suit was brought to recover damages for personal injuries said to have been received by Mame S. Mayer, an infant, by reason of a broken piece of glass striking and cutting into her eye, which glass was a part of a window in the house in which she was, and which was caused to be broken by an explosion occurring in the building owned by the defendant.

This injury was received by Mame on the 2d of May, 1903.

---

* Affirmed without opinion, *Brudno v. Mayer,* 82 Ohio State, 436.

That the injury was received is clearly shown and not denied; that the cause of the injury was the explosion of something in the building named is clearly shown; that the property was at the time owned by the defendant is clearly shown, and that it was under lease at the time to a firm, the name of which was the Thor Manufacturing Company, and that the business of such firm was the manufacture of various devices, used largely by children on holiday occasions, and especially on the Fourth of July, is also shown; that a part of these devices are what is known as torpedoes, which were made for the purpose of and which will explode, when being brought with force against stone or other like hard substance, and the ingredients of which they were mixed for the purpose of producing a compound which would thus explode are likewise shown in the evidence, and are not shown to be explosive except when combined in such wise as to produce these torpedoes.

On the day the explosion occurred which caused the plaintiff's injury, there was a large quantity of these torpedoes stored in the building, and in some manner there was an explosion which destroyed the building and injured many buildings for a considerable distance from the one in which the explosion occurred. The lessees of this building were in the occupancy of it, for the same purpose, for a considerable time before it was purchased by the defendant, and an agreement was made between the lessees and the defendant that the lessees might continue in such occupancy up to and after the Fourth of July. At the close of the evidence on the part of the plaintiff the court directed the jury to return a verdict for the defendant, and this is complained of. It is urged that the evidence does not show that the defendant could know that such explosive matter was kept in quantities which could produce a great explosion, nor indeed that a great explosion would result from keeping it in any quantities, even though there should be an accident which would cause one or more of the torpedoes to explode. We think that the evidence of Martin J. Mayer tends to show that the defendant knew what was being manufactured in this building. Testimony of John Trottner shows that Mr. Brudno was in the

factory a considerable number of times while the manufacture of these torpedoes was going on; that he was shown about the premises by Mr. Cole, one of the lessees, which tends, we think, to show that he saw and appreciated what the manufactured product was. He says that he saw Mr. Cole, in Brudno's presence, explode some of these torpedoes. From this evidence the jury might come to the conclusion that Brudno was aware that torpedoes were being manufactured in this building, and that these torpedoes were explosive; that they were small and a single torpedo produced but little sound, though it was sufficient to. be heard for quite a distance and that the disturbance of the atmosphere about it would not be great, though it would amount to something, so that it would seem that an inference might be drawn from the fact that if a torpedo of the size of that ordinary filber would produce the sound that it is shown this did produce (which sound, of course, is produced by the displacement of the air about it), that the explosion of a great quantity of them would produce a proportionately greater disturbance, and that since each was explosive the explosion of one would be likely to produce the explosion of another coming in contact with it, and so when a great quantity of them would produce a proportionately greater disturbance, and that since each was explosive, the explosion of one would be likely to produce the explosion of another coming in contact with it, and so when a great quantity of them were placed in contact with each other, in a box, and then a great number of these boxes piled together, that a sudden jar or the bringing of a hard substance in contact with one or more of these torpedoes might produce a dangerous explosion. That being so, we think that the court should have submitted to the jury the question whether the facts which were shown to be within the knowledge of the defendant, were such as to charge him with knowledge of the dangerous character of the business carried on in his building. We think the reasoning in *Glycerine Co.* v. *Woolen Co.*, 60 O. S., 560, supports this view, but it is also supported by *Tiffin* v. *McCormick*, 34 O. S., 638; *Gas Company* v. *Andrews*, 50 O. S., 695, and *Defiance Water Company* v. *Olinger*, 54 O. S., 532.

As said in the case of *Gylcerine Company* v. *Woolen Company*, *supra,* the leading case on the question of how far the owner of property is responsible for injuries resulting to others from the use of his property in a legitimate way, but in a way which is dangerous, is the case of *Fletcher* v. *Rylands*, L. R., 1 Exch., 265. That was a case where the defendant had constructed the reservoir for holding a large amount of water. Under the reservoir there had been mining, so that there were excavations in the earth, but these had long been covered, though not filled. The fact of their existence was unknown to the defendant, and unknown, apparently, to everybody who had anything to do with the premises. On a parcel of land adjoining the land on which the reservoir was constructed there had also been mining. The plaintiff had a parcel of land not adjoining the premises on which the reservoir was situated, but adjoining the parcel of land which itself joined the reservoir tract. Mining was carried on by the plaintiff on his premises, and under lease from the owner of the intervening premises, who also conducted mining, and the mining so carried on in the intervening premises reached up to the excavations which had before that existed in this intervening tract. The reservoir being party filled with water gave way, because of the excavations under it, of which the owner had no knowledge; the result was the plaintiff's mine was flooded by the water passing from this reservoir through the excavations which had been made in mining between the reservoir property and the plaintiff's property, and the court held that the defendant was liable, and this was affirmed on appeal to the House of Lords.

It is not necessary, however, to go as far in the case before us in order to hold the defendant liable as in the Rylands case. We think if the case had been submitted to the jury the questions to be answered by the jury would have been, was the business carried on in these premises dangerous and such that a dangerous explosion might reasonably have been anticipated, and did the defendant have such knowledge of that business as that a man of reasonable prudence would have recognized the liability of having such an explosion as the one which occurred?

We reach the conclusion, therefore, that the court erred in directing a verdict for the defendant; the cause should have been submitted to the jury with proper instructions. Judgment is therefore reversed and the cause remanded.